UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

CHRISTOPHER O. BRANDT,               )
                                     )
             Plaintiff,              )
                                     )
       v.                            )          Docket No. 1:15-cv-00461-NT
                                     )
JOSEPH FITZPATRICK, et al.           )
                                     )
             Defendants.             )

## DEFENDANT LISA NASH'S MOTION FOR SUMMARY JUDGMENT
## WITH INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 56, Defendant Lisa Nash ("Defendant Nash") moves for summary judgment on the single remaining count against her in the Amended Complaint ("Complaint"):  Count Five, "Racial Discrimination" in violation of 42 U.S.C. § 1983.

### FACTS

The relevant material facts are recited in their entirety in the accompanying Joint Statement of Material Facts ("JSMF").  The following is a brief summary for this motion.

## I.    BACKGROUND AND RELEVANT OPEN POSITIONS

Defendant Lisa Nash ("Defendant Nash") has worked in corrections for approximately 33 years.  JSMF ¶ 3.  As a former Regional Correctional Administrator for the MDOC, Defendant Nash was sometimes part of a panel of interviewers for open probation officer and probation officer assistant positions for Region 1.  JSMF ¶ 4.  However, in her role, Defendant Nash did not have authority to make hiring decisions regarding applicants for any of the positions.  JSMF ¶ 5.  Instead, the final decision to hire any particular probation officer or probation officer assistant applicant was made by the Commissioner or one of the Associate Commissioners of the MDOC.  JSMF ¶ 6.

The mission of the MDOC is to reduce the likelihood that juvenile and adult offenders will re-offend, by providing practices, programs, and services which are evidence-based and which hold the offenders accountable.  JSMF ¶ 9.  Evidence-based practices, which are at the core of the MDOC's mission, involve a process of making decisions based on conditions and assessments to reduce the likelihood that an offender will offend again.  JSMF ¶ 10 – 11.

Probation Officers supervise adult offenders and have a wide range of case management responsibilities.  JSMF ¶ 13 – 14.  Required knowledge, skills, and abilities include, but are not limited to, knowledge of social service agencies; knowledge of investigative practices; knowledge of motivational interviewing techniques; knowledge of evidence-based practices; ability to counsel adult offenders; ability to prepare and maintain detailed records/reports and individual rehabilitation case plans; ability to communicate effectively orally and in writing; ability to apply casework principles and techniques; ability to objectively assess offenders and make appropriate decisions; ability to administer assessment tools to make individual situational determinations; ability to distinguish between obligation to public safety and responsibility to offender; and ability to work without direct supervision.  JSMF ¶ 15.  Probation Officer Assistants work in a paraprofessional capacity to assist Probation Officers, and they require much of the same knowledge, skills, and abilities as Probation Officers.  JSMF ¶ 16 – 18.

Recruitments for MDOC Probation Officer and Probation Officer Assistant positions are highly competitive, and most successful applicants apply multiple times before they are ultimately selected for a position.  JSMF ¶ 145.

## II.   BRANDT'S APPLICATION

Plaintiff Christopher Brandt ("Brandt"), who was employed as a correctional officer at the Maine Correctional Center in Windham from November 26, 2012, through January 8, 2014,

applied for various Probation Officer and Probation Officer Assistant positions with the MDOC in 2012 and 2013.  JSMF ¶ 19 – 20.

The positions were "direct hire," which means that applications were handled directly by MDOC Human Resources personnel.  JSMF ¶ 21.  Applicants were selected for interviews if they met the minimum qualifications and minimum cut-off scores or were current MDOC employees, such as Brandt, regardless of their scores.  JSMF ¶ 22 – 27.  The interview panels conducted the interviews and made recommendations to the MDOC Commissioner's office, which made the final selection decision.  JSMF ¶ 29 – 30.

Brandt submitted essentially the same application and resume for each relevant vacancy. His resume reflected that he worked as a Diplomatic Security Special Agent and a corrections officer; that he had experience conducting investigations, providing property protection, and deploying security personnel, crowd control, evacuation, and crisis intervention; that he was trained in threat assessment and management and martial arts; and that he was an expert marksman.  JSMF ¶ 33 – 35.  Brandt's application and resume did not show that he had any experience in case management whatsoever, or that he had any knowledge of, or familiarity with, evidence-based practices.  JSMF ¶ 36 – 37.  Brandt did not have any prior experience as a probation officer or a probation officer assistant, and he did not state in any of his interviews that he had any case management experience of any type or any experience with evidence-based practices or principles in any way.  JSMF ¶ 38 – 39.  Brandt is unable to identify any of the evidence-based practices or describe them in general terms.  JSMF ¶ 12.

Defendant Nash was part of an interview panel that interviewed Brandt in connection with three different recruitments:  (1) the December 2012 and January 2013 recruitment, which was a combined effort based on a single set of interviews; (2) the August 2013 recruitment; and

3

(3) the December 2013 recruitment.  Defendant Nash was not involved in interviewing Brandt in connection with any other recruitment.  JSMF ¶ 45, 70, 109.

## III.    THE FIRST RECRUITMENT

The first recruitment effort, consisting of one hiring process and one set of interviews, was for two vacancies for a Probation Officer position in the Portland probation office.  One position was posted on December 4, 2012, and the second was posted on January 8, 2013.  JSMF ¶ 53 – 55.  Thirty applicants were selected for interviews, including Brandt.  JSMF ¶ 56.  The interview panel for this recruitment consisted of Defendant Nash; Allen Wright, Regional Correctional Manager; and Chris Arbour, Regional Correctional Manager.  JSMF ¶ 57.  The panel asked the same questions of all candidates during the interviews.  JSMF ¶ 58.

The panel recommended Patricia Ledoux for one of the positions because she was the most qualified.  She had been a federal probation officer for six years.  She had solid experience with all aspects of probation officer work at the federal level.  Her responses to the interview questions were very much on target, and it was clear that she had a solid understanding of the importance of implementing evidence-based practices.  She was very interested in working with offenders and incorporating more group programming for offenders.  JSMF ¶ 59.  Ms. Ledoux's application and resume also reflected that she had supervised a caseload of between 35 and 70 offenders and defendants; had experience conducting psycho-social assessments; worked as a Human Services Caseworker for two years; and had worked as a case manager for Counseling Services, Inc.  JSMF ¶ 60.

The panel recommended Megan Entwistle for the second position because she was the most qualified.  She was working as a probation officer assistant and was well organized and thorough in all of her work.  She also had relevant education and had solid experience with case

management in past jobs.  She also had experience with managing and organizing programs and working with at-risk females in difficult situations.  She was highly motivated and had a reputation for going the extra mile.  JSMF ¶ 61.  Ms. Entwistle's resume also reflected her experience as a case manager, working with at-risk women and children, developing service plans, networking with local community service providers, facilitating community meetings, and maintaining case records.  JSMF ¶ 62.

In contrast, the panel concluded that Brandt had little to no experience in complex or simple case planning.  He appeared to have no understanding whatsoever of evaluating offenders or using any evidence-based practices in decision-making.  Brandt had skills in some areas, but not in the critical areas essential to being a probation officer.  JSMF ¶ 63.  Brandt does not recall anything specific about the December 2012 recruitment interview other than he said he thought Portland and Maine were changing and getting more diverse and he thought it would be good to see diversity in officers that help individuals, and he asked about the job.  JSMF ¶ 64.  The Commissioner's office made the final decision to hire Ms. Ledoux and Ms. Entwistle for the positions.  JSMF ¶ 65.

## IV.    THE SECOND RECRUITMENT

The second recruitment effort, posted on August 16, 2013, was for two vacancies for Probation Officer positions in the Portland probation office.  JSMF ¶ 84.  Forty applicants were selected for interviews, including Brandt.  JSMF ¶ 85.  The MDOC implemented certain changes in the hiring process in August 2013, including rating each candidate on an Oral Examination Rating Form.  JSMF ¶¶ 86 – 90.  The interview panel for this recruitment consisted of Allen Wright; Defendant Nash; and Scott Dewitt, TSC III.  JSMF ¶ 91.  All candidates were asked the same questions during the interviews.  JSMF ¶ 92.

One vacancy was placed on hold and not filled.  The panel recommended Alicia Cummings for the other position because she was the most qualified.  She already was working as a probation officer assistant for the MDOC.  She demonstrated excellent critical thinking skills and appeared comfortable with making difficult decisions.  She previously worked for many years as a DHHS child protective case worker, and she forged a strong relationship with a local police department and was proactive in working with families to reduce law enforcement involvement.  The panel thought that she was very articulate and had a good understanding of the nuances involved with working with the population involved with the position.  JSMF ¶ 93.

Although Brandt had a law enforcement background, the panel concluded that he had no relevant case management or assessment experience.  It appeared that the type of management experience he had was in managing criminal investigations, rather than client-focused case management.  The panel concluded that with more experience, Brandt could become a good candidate.  JSMF ¶ 94.  Although he stated in his deposition that the interview was "hostile," the only basis that Brandt has for calling the interview hostile is that none of the panel members shook his hand when he walked in until he initiated it, he was interrupted several times, and he sensed the panel's "body language" said why does he keep applying, although no one actually said that to him or otherwise stated that he was not qualified.  JSMF ¶ 96.

In addition, on the new Oral Examination Rating Form, each panel member separately rated Ms. Cummings higher than Brandt on the five relevant criteria, (1) Commitment and Job Knowledge, (2) Judgment and Logic, (3) Decision Making and Decisiveness, (4) Communication Skills, and (5) Ethics and Integrity.  The panel members gave Ms. Cummings a total of 53 points and Brandt a total of 36 points.  JSMF ¶¶ 87, 95.  The Commissioner's office made the final decision to hire Ms. Cummings for the position.  JSMF ¶ 97.

## V.   THE THIRD RECRUITMENT

The third recruitment effort, posted on December 5, 2013, was for a vacancy for a Probation Officer Assistant position in the Portland probation office.  JSMF ¶ 99.  Eleven applicants were selected for interviews, including Brandt.  JSMF ¶ 100.  The interview panel for the December 2013 recruitment consisted of Defendant Nash, Allen Wright, and Scott DeWitt.  JSMF ¶ 101.  All candidates were asked the same questions during the interviews.  JSMF ¶ 102.

The panel recommended Brooke Bowley for the position because she was the most qualified.  She was working for the Department as a juvenile program specialist and had solid experience in corrections and case management.  She demonstrated familiarity with how to assess the risk of an offender and with motivational interviewing of offenders, which focuses on increasing motivation to change.  She was articulate and appeared to have solid decision-making skills.  JSMF ¶ 103.  As a juvenile program specialist, Ms. Bowley also had experience with promoting treatment services, rehabilitation, and behavior modification; developing and implementing individual treatment plans; and assisting in educational programs and facilitating treatment groups.  She also had experience as a counselor, assisting residents in developing life skills, supervising clients, and executing individual treatment plans.  JSMF ¶ 104.

The panel agreed that Brandt was not clear about the mission of the Department and was not clear regarding the roles and responsibilities of a Probation Officer Assistant.  The panel agreed that Brandt had strong skills in some areas; however his skill set was not as strong as other candidates in the areas of case planning and case management, which are essential to the Probation Officer Assistant position.  JSMF ¶ 105.  Brandt cannot recall anything about the December 2013 recruitment interview other than a different individual was there and maybe it

7

was not as hostile because the panel shook his hand when he came in, he did not sense the same

body language, and the questions were different.  JSMF ¶ 107.

In addition, on the Oral Examination Rating Form, each panel member separately rated

Ms. Bowley higher than Brandt on the five relevant criteria.  The panel members gave Ms.

Bowley a total of 46 points and Brandt a total of 35 points.  JSMF ¶ 106.  The Commissioner's

office made the final decision to hire Ms. Bowley.  JSMF ¶ 108.

When Brandt resigned from the MDOC on January 8, 2014, he stated in his letter that

"[f]rom the interview process, I felt all employees at [Maine Correctional Center] looked at the

content of my character and not my skin color."  JSMF ¶ 110, 111.

## ARGUMENT

## I.    STANDARD FOR GRANTING SUMMARY JUDGMENT

Summary judgment is appropriate when the record shows there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

"Genuine" means that "a reasonable jury could resolve the point in favor of the nonmoving

party," and "material" means its "existence or nonexistence has the potential to change the

outcome of the suit."  *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of

London*, 637 F.3d 53, 56 (1st Cir. 2011).  The nonmoving party must produce specific facts to

establish the presence of a trialworthy issue.  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200

F.3d 1, 2 (1st Cir. 1999).  If the nonmoving party "fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the

burden of proof at trial," the court should grant summary judgment.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).

8

Although the Court views the evidence in the light most favorable to the non-moving party, "[a] properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010). Evidence that is "merely colorable, or is not significantly probative" will not defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Even when cases involve concepts such as motive or intent, summary judgment is appropriate if the nonmoving party rests merely upon conclusory allegations, inferences, and speculation. *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003).

## II.    BRANDT CANNOT PROVE THAT DEFENDANT NASH'S CONDUCT RESULTED IN A CONSTITUTIONAL VIOLATION UNDER SECTION 1983

Brandt asserts a claim against Defendant Nash under 42 U.S.C. § 1983 for "Racial Discrimination." Complaint, Count Five. To prevail on a claim under section 1983, a plaintiff must prove that (1) the defendant acted under color of state law, and (2) the defendant's actions deprived him of a right secured by the Constitution or laws of the United States. *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 902 (1st Cir.1988). As noted in the Court's Order on Defendants' motions to dismiss (ECF No. 28), p. 11, Brandt is pursuing a claim under section 1983 based on a violation of the Equal Protection Clause.

### A.    Standard For Proving Individual Liability Under Section 1983

Individual officials who directly engage in a constitutional violation may be subject to section 1983 liability. *Id.*, at 901. A plaintiff must prove that the official, "through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "As a general matter, liability for public officials under section 1983 arises only if 'a plaintiff can establish that his or her constitutional injury resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit

9

authorization.'" *Grajales v. Puerto Rico Ports Authority*, 682 F.3d 40, 47 (1st Cir. 2012)

(quoting *Ocasio-Hernandez v. Fortuño-Burset*, 640 F.3d 1, 16 (1st Cir. 2011)).  This standard

can be satisfied by direct, personal participation in the constitutional deprivation or "by setting in

motion a series of acts by others which the actor knows or reasonably should know would cause

others to inflict the constitutional injury." *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 50 (1st Cir.

2009).  "In either case, the plaintiff in a Section 1983 action must show an '*affirmative link* . . .

between the actor and the underlying violation.'"  *Id.* at  49 (1st Cir. 2009) (quoting *Camilo-

Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999) (emphasis added).  Moreover, in any event,

"[t]he showing of causation must be a strong one, as that requirement 'contemplates proof that

the supervisor's conduct led *inexorably* to the constitutional violation.'"  *Ramirez-Lluveras v.

Rivera-Merced*, 759 F.3d 10, 19 (1st Cir. 2014) (quoting *Hegarty v. Somerset Cnty.*, 53 F.3d

1367, 1380 (1st Cir. 1995) (emphasis in original).

### B.    Defendant Nash Did Not Cause A Constitutional Violation

Significantly, Defendant Nash was not the final decision-maker.  She was just one

member of three-person interview panels, and there is no evidence to suggest that Defendant

Nash in any way improperly influenced the unanimous decision of the panel to recommend

applicants with better qualifications.  Further, there is no evidence to suggest that Defendant

Nash met with or communicated with the Commissioner's office regarding the final selection or

in any way influenced the final selection decision.

Given that Defendant Nash was only one member of the interview panel and did not

make the final recommendation or selection decision, Brandt cannot offer evidence to prove that

Defendant Nash directly engaged in a constitutional deprivation or that she condoned or engaged

in any tacit authorization of any alleged constitutional deprivation.  Further, Brandt cannot offer

evidence to prove that Defendant Nash set in motion a series of acts to cause others, including the other members of the interview panel or the Commissioner's office, to engage in a constitutional deprivation.  Brandt also cannot offer any evidence to show an "affirmative link" between Defendant Nash's participation as one-third of the interview panel and any scheme or action to reject Brandt based on his race.  Brandt cannot show that Defendant Nash, by herself, made a hiring decision or recommendation, or otherwise set in motion a series of acts, which she knew would have resulted in a constitutional deprivation.  *See Ocasio-Hernandez*, 640 F.3d at 16 (plaintiff must show that each individual defendant's role in the decision led to a violation). Certainly, there is nothing in the record to suggest that Defendant Nash's conduct in acting as a single member of the interview panel *led inexorably* to a constitutional violation.  *See Ramirez-Lluveras*, 759 F.3d at 19.

## III.   BRANDT CANNOT PROVE THAT DEFENDANT NASH VIOLATED HIS RIGHT TO EQUAL PROTECTION

### A.   Standard For Proving A Violation of Equal Protection

To prove an equal protection claim, a plaintiff must show that (1) he was treated differently than others who were similarly situated, and (2) the difference in treatment was based on an impermissible consideration.  *Ayala–Sepulveda v. Municipality of San German*, 671 F.3d 24, 32 (1st Cir. 2012).  Furthermore, when, as in this case, section 1983 is used as a parallel remedy to a statutory discrimination claim, "the prima facie elements to establish liability are the same under both statutes."  *Rivera v. Puerto Rico Aqueduct & Sewers Auth.*, 331 F.3d 183, 192 (1st Cir. 2003).

Employment discrimination cases alleging disparate treatment in violation of Title VII proceed under the familiar three-step burden shifting framework.  First, the plaintiff must make out a prima facie case of discrimination.  The burden then shifts to the defendant to present a

legitimate, non-discriminatory reason for the underlying employment decision.  Finally, the burden shifts back to the plaintiff to prove that the non-discriminatory reason is a mere pretext and the real reason for the decision is unlawful discrimination.  *Goncalves v. Plymouth County Sheriff's Dep't*, 659 F.3d 101, 104 – 05 (1st Cir. 2011); *Clifford v. Barnhart*, 449 F.3d 276, 280 – 81 (1st Cir. 2006).  Throughout the process, "the plaintiff bears the 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Gu v. Boston Police Dept.*, 312 F.3d 6, 11 (1st Cir. 2002) (quoting *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

### B.    Brandt Cannot Prove A Prima Facie Case Of Discrimination

In a failure to hire case, the plaintiff must prove a prima facie case of discrimination by showing:  (1) he is a member of a protected class, (2) he was qualified for an open position for which he applied, (3) he was not selected for the position, and (4) someone holding similar qualifications was hired instead.  *Goncalves*, 659 F.3d at 105; *Deslauriers v. Napolitano*, 738 F. Supp.2d 162, 176 (D. Me. 2010).  Brandt cannot prove the fourth element of his prima facie case:  a comparison of Brandt's qualifications to the qualifications of the selected applicants shows that the selected applicants had demonstrably superior qualifications and therefore were not "similarly" qualified.  A brief summary of the undisputed facts demonstrates the dissimilarities.

The first recruitment:  Patricia Ledoux had been a probation officer for six years and had experience with all aspects of probation officer work; her responses to the interview questions were on target; she had a solid understanding of the importance of implementing evidence-based practices; she had supervised a caseload of up to 70 offenders; she had experience conducting psycho-social assessments; and she worked as a human services caseworker and manager.

12

Megan Entwistle was working as a probation officer assistant and was well organized and thorough; she had relevant education and experience with case management and managing and organizing programs and working with at-risk females in difficult situations; she was highly motivated and had a solid reputation; and she worked with at-risk women and children, developed service plans and networked with local community service providers, facilitated community meetings, and maintained case records.

In contrast, Brandt had little to no experience in complex or simple case management or planning and had no understanding of evaluating offenders or using evidence-based practices in decision-making.  Although Brandt had skill in some areas, he did not have skills or experience in the critical areas essential to being a probation officer.

The second recruitment:  Alicia Cummings was working as a probation officer assistant for the Department; she demonstrated excellent critical thinking skills and was comfortable with making difficult decisions; she worked for many years as a DHHS child protective case worker; she forged a strong relationship with a local police department and was proactive in working with families to reduce law enforcement involvement; she was very articulate; and she had a good understanding of the nuances involved in working with the relevant population.

In contrast, Brandt had no relevant case management or assessment experience.  The type of management experience he had was in managing criminal investigations, rather than client-focused case management.  In addition, on the Oral Examination Rating Form, each panel member separately rated Ms. Cummings higher than Brandt on the five relevant criteria, giving Ms. Cummings a total of 53 points and Brandt a total of 36 points.

The third recruitment:  Brooke Bowley was working for the MDOC as a juvenile program specialist and had experience in corrections and case management; she demonstrated

13

familiarity with offender risk assessment and motivational interviewing of offenders; she was articulate and had solid decision-making skills; she had experience with promoting treatment and rehabilitation services and behavior modification, developing and implementing individual treatment plans, assisting in educational programs, and facilitating treatment groups; and she had experience as a counselor and assisted residents in developing life skills, supervised clients, and executed individual treatment plans.

In contrast, Brandt was not clear about the mission of the Department or the roles and responsibilities of a Probation Officer Assistant, and he did not have skills in the areas of case planning and case management, which are essential to the Probation Officer Assistant position. In addition, each panel member separately rated Ms. Bowley higher than Brandt on the five relevant criteria, giving Ms. Bowley a total of 46 points and Brandt a total of 35 points.

*Goncalves* is instructive.  In that case, the plaintiff alleged that a county sheriff's department failed to promote her on the basis of her race, gender, national origin, and age. During a four year period, the plaintiff applied for and was denied promotions to four different positions.  The First Circuit affirmed summary judgment for the defendant, finding, *inter alia*, that the plaintiff failed to prove a prima facie case because the applicants selected had superior qualifications and therefore did not hold similar qualifications.  *Goncalves*, 659 F.3d at 106 – 07. The court explained that, to satisfy the fourth element of her prima facie case, the plaintiff was required to show that she was similarly situated to the hired candidates.  "Similarly situated candidates must share 'roughly equivalent qualifications to perform substantially the same work,'" and "[t]hey must be similar in 'material respects,'' i.e., 'apples should be compared to apples.'"  *Id.* at 106 (internal citations omitted).  The court compared the qualifications of the plaintiff and the successful candidates and noted that—as in this case—the plaintiff did not have

14

the same work experience or relevant background as the successful candidates and did not work

in the same related fields as the successful candidates.  The court also noted that—as in this

case—the plaintiff had lower interview scores than the successful candidates.  The court rejected

the plaintiff's argument that because she advanced through the selection process she must have

been similarly situated to the successful candidates.  The court ruled that "[s]uch arguments are

not sufficient for purposes of establishing a genuine issue of material fact," and "[w]here the

record shows that an employee was in fact *differently* situated from other candidates, we cannot

rely on 'overly attenuated inferences, unsupported conclusions, and rank speculation' to quiet the

tolling of the summary judgment bell."  *Id.* at 107 (emphasis in original) (internal citation

omitted).  Finally, the court emphasized that:

> It is not our role to "sit as super personnel departments, assessing the merits—or even the
> rationality—of employers' nondiscriminatory business decisions."  *Mesnick v. Gen. Elec.
> Co.*, 950 F.2d 816, 825 (1st Cir. 1991).  Employee "[q]ualifications are notoriously hard
> to judge," and "more must be shown than that the employer made an unwise personnel
> decision."  *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir. 2004).  Because [the
> plaintiff] has failed to show that she was either qualified or similarly situated to the
> candidates selected for the [open positions]—whether in work experience, [related] skills,
> or overall interview and test performance—she cannot meet her burden of showing a
> prima facie case of discrimination.

*Id.*

As in *Goncalves*, in this case the successful candidates were not situated similarly to

Brandt in material ways—i.e., the relative qualifications were not a case of apples to apples—

because each of the candidates had actual and substantial experience in probation work and in

case management, were aware of and had experience with the principles central to the mission of

the MDOC, answered the interview questions in a much more apt manner, and for the last two

recruitments scored higher on the ratings of *all three* of the interviewers.  As in *Goncalves*,

Brandt cannot under these circumstances satisfy the fourth element of his prima facie case.  *See*

*also Gordon v. Mass. Bay Transp. Auth.*, 2014 U.S. Dist. LEXIS 152746, *78 – 80 (D. Mass. Oct. 28, 2014) (plaintiff who had lower interview scores and was unable to answer questions accurately in comparison to the chosen candidate could not establish the fourth element of prima facie case).

The dissimilarities in Brandt's qualifications compared to the successful candidates' qualifications are especially compelling in the context of a section 1983 action because "plaintiffs claiming an equal protection violation must first 'identify and relate *specific instances* where persons *situated similarly in all relevant respects* were treated differently, instances which have the capacity to demonstrate that plaintiffs were singled out for unlawful oppression.'" *Ayala–Sepulveda*, 671 F.3d at 32 (quoting *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006)) (emphasis in original).   This showing is necessary because the underlying purpose of the Equal Protection Clause in a section 1983 action is to ensure that *similarly situated people* will be treated alike.   *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439-40 (1985); *In re Subpoena to Witzel*, 531 F.3d 113, 118 – 19 (1st Cir. 2008).

### C.   Brandt Cannot Prove That The Legitimate Reasons For Selecting Other Candidates Are A Pretext For Discrimination By Defendant Nash

Even if Brandt could establish a prima facie case of discrimination, Defendant Nash has presented legitimate, non-discriminatory reasons for her recommendations:   each of the successful candidates was more qualified.   They had relevant experience in working in probation and conducting case management, relevant education, a better understanding of evidence-based practices and the requirements of the probation positions, better answers to interview questions, and higher ratings by the interviewers.   *See Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir. 2004) (superior qualifications show an employer's legitimate reason for making a hiring decision).   Accordingly, the burden shifts back to Brandt to prove that these non-discriminatory

16

reasons are a mere pretext and the real reason for the decision is unlawful discrimination by Defendant Nash. *See id.* Brandt cannot meet this burden.

The record is devoid of any evidence to suggest, let alone demonstrate, that the reasons that the successful candidates were chosen over Brandt were pretext or that Defendant Nash was motivated by discrimination in any way. Brandt cannot point to any statements or conduct in any of the interviews that suggest discriminatory motive by Defendant Nash. Brandt cannot recall anything specific or noteworthy about any of the three interviews with Defendant Nash except that he sensed that the second interview was hostile because he had to offer to shake the hands of the interview panel members before they offered to shake his hand and because he sensed negative body language. Of course, Brandt cannot compare this conduct with the conduct of any other interview, and there is no case to suggest that an applicant's subjective sense of body language is sufficient to suggest pretext or discriminatory animus. Brandt also admitted in his resignation letter that he believed that, in the interview process, the interviewers looked at the content of his character and not the color of his skin. Furthermore, as discussed above, Brandt scored lower than the successful applicants—and lower than most of the applicants interviewed—so he cannot plausibly suggest that he was better qualified for the open positions.

Indeed, it is clear that any effort by Brandt to try to prove pretext or discriminatory animus by suggesting he was better qualified would be unavailing. As the First Circuit has explained:

> When an employer claims to have hired or promoted one person over another on the basis of qualifications, the question is not which of the aspirants was better qualified, but, rather, whether the employer's stated reasons for selecting one over the other were pretextual. In a rare case, the disappointed applicant may be able to prove pretext by showing that she was in fact better qualified than the individual selected. But that is an uphill struggle: in the absence of strong objective evidence (e.g., test scores), proof of competing qualifications will seldom, in and of itself, be sufficient to create a triable issue of pretext.

> This result follows from a form of the business judgment rule. *See Mesnick,* 950 F.2d at 825 (explaining that "[c]ourts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions"). Qualifications are notoriously hard to judge and, in a disparate treatment case, more must be shown than that the employer made an unwise personnel decision by promoting "X" ahead of "Y."

*Rathbun*, 361 F.3d at 74.

The court in *Rathbun* concluded that the plaintiff could not generate any evidence to show that a genuine dispute existed as to qualifications.  In affirming summary judgment for the defendant, the court held that, "[w]ithout controlling for other important variables, comparator evidence cannot generate an inference either of pretext or of discriminatory intent," and that "[o]n this record, allowing the failure-to-promote claims to go forward would be an invitation to the jury to engage in unbridled speculation." *Id.* at 77.  That conclusion is especially compelling in this case, when the record clearly demonstrates that the successful candidates had superior qualifications.  *See also Clifford*, 449 F.3d at 281 – 83 (plaintiff could not show pretext based on his knowledge, experience, and relative qualifications; fact that plaintiff may have excelled in certain areas insufficient to show discriminatory animus, especially when other candidates were better qualified); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180 – 81 (7th Cir. 2002), *cert. denied*, 537 U.S. 884 (2002) (evidence of the plaintiff's competing qualifications does not show pretext unless the differences are so favorable to the plaintiff that no reasonable person could dispute that the plaintiff was clearly better qualified); *Deslauriers*, 738 F. Supp. 2d at 179 – 80 (D. Me. 2010) (plaintiff's attempt to argue he had better qualifications not sufficient to show pretext in absence of evidence of discriminatory animus, citing business judgment rule:  court will not sit as super personnel department to substitute its judgment for the judgment of the defendant).

IV.     **DEFENDANT NASH IS ENTITLED TO QUALIFIED IMMUNITY**

A public official sued in her individual capacity under section 1983 is entitled to qualified immunity unless (1) the plaintiff demonstrates that the individual defendant's conduct violated a statutory or constitutional right, and (2) the contours of that right were "clearly established" under then-existing law, so that a reasonable government official would have known that her conduct was unlawful.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 741 (2011); *Morales v. Chadbourne*, 793 F.3d 208, 214 (1st Cir. 2015).  For the contours of an alleged right to be "clearly established" at the time of the challenged conduct, the right must be sufficiently clear so that a reasonable official would understand that what she was doing violated the right.  *Id.*; *Decotiis v. Whittemore*, 635 F.3d 22, 36 – 37 (1st Cir. 2011).  The inquiry focuses on the facts of the particular case to determine whether a reasonable defendant would have known that her conduct violated the plaintiff's constitutional rights.  *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013); *Decotiis*, 635 F.3d at 36 (inquiry focuses on specific context of the case).

As to the first element, as discussed above, the facts do not demonstrate a violation of the Equal Protection Clause.  Accordingly, Brandt cannot show that Defendant Nash violated his constitutional right.

As to the second element, there is no clearly established case law to provide notice to Defendant Nash that she was doing anything that could result in a violation of Brandt's constitutional right to equal protection under the particular facts of this case.  Defendant Nash acted as a single member on equal footing with other members of an interview panel, and she and the other panel members independently agreed to recommend more qualified applicants over Brandt based on their individual assessments, in accord with the other members of the panel.  As discussed above, there is no evidence to show that Defendant Nash had any influence over the

19

other panel members in making recommendations or the Commissioner's office in making the final hiring decision.

Defendant Nash is not aware of any case law clearly establishing, or even suggesting, that her actions under these circumstances would violate Brandt's right to equal protection.  In other words, even if Defendant Nash acted with discriminatory animus as alleged (and the record shows she did not), there is no case to put her on notice that by simply participating on an interview panel with other members and making recommendations in accord with the other members—without having influence over the other members or the final selection decision—she was violating Brandt's constitutional right to equal protection.  *See Roque-Rodriguez v. Lema Moya*, 926 F.2d 103, 107 (1st Cir. 1991) (even if an official actually violated a plaintiff's rights, the official is entitled to immunity if the right in question was not clearly established; a plaintiff who is entitled to prevail on the merits is not necessarily entitled to prevail on the issue of qualified immunity).  Accordingly, Defendant Nash is entitled to qualified immunity.

## CONCLUSION

For all of the reasons set forth above, Defendant Nash respectfully requests that the Court grant summary judgment in her favor on the remaining Count against her.

Dated:  March 2, 2018

/s/ Eric J. Uhl
Eric J. Uhl
**LITTLER MENDELSON, P.C.**
One Monument Square, Suite 600
Portland, ME  04101
(207) 774-6001
euhl@littler.com

Attorney for Defendant Lisa Nash

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I caused to be electronically filed the foregoing

document using the CM/ECF system which will send notification of such filing to all registered

participants.

Dated:  March 2, 2018

/s/ *Eric J. Uhl*
Eric J. Uhl, Esq.
LITTLER MENDELSON, P.C.
One Monument Square, Suite 600
Portland, ME 04101
(207) 774-6001
euhl@littler.com

Attorney for Defendant Lisa Nash

21