## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| CHRISTOPHER O. BRANDT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Docket No. 1:15-cv-461-NT |
| | ) |
| JOSEPH FITZPATRICK, in his | ) |
| official capacity as COMMISSIONER, | ) |
| MAINE DEPARTMENT OF | ) |
| CORRECTIONS; SCOTT LANDRY; | ) |
| and LISA NASH, | ) |
| | ) |
| Defendants. | ) |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before me is the motion for summary judgment of Defendants Joseph Fitzpatrick[1] and Scott Landry (the "**State Defendants**") (ECF No. 88). For the reasons that follow, the State Defendants' motion for summary judgment is **GRANTED**.

## FACTUAL BACKGROUND[2]

### I.    The Parties

Plaintiff Christopher O. Brandt, an African American man and a veteran, was employed as a correctional officer at the Maine Correctional Center ("**MCC**") from November 26, 2012, through January 8, 2014. CSMF ¶ 19. While he was employed at

---

[1]    The Plaintiff has named Fitzpatrick as a defendant in his official capacity as Commissioner of the Maine Department of Corrections ("**MDOC**").

[2]    The following facts are drawn from the parties' Consolidated Statement of Material Facts ("**CSMF**") (ECF No. 100), and from materials in the record, taken in the light most favorable to the Plaintiff.

the MCC, Brandt applied repeatedly for positions as a probation officer or probation officer assistant with the Maine Department of Corrections ("**MDOC**"). Each of his applications was unsuccessful. During that same period, the MDOC employed no black probation officers and the only other black applicant for a probation position also was not hired. CSMF ¶¶ 160-161.

Defendant Joseph Fitzpatrick is the Commissioner of the MDOC, which administers the MCC and Maine's other correctional facilities and programs. CSMF ¶ 1. Defendant Scott Landry has been Warden of the MCC since July 2013, and before that he was Regional Correctional Administrator for Region 2 of the MDOC. CSMF ¶ 2. Defendant Lisa Nash was Regional Correctional Administrator for Region 1 of the MDOC for approximately 10 years, ending in 2016. CSMF ¶ 3. As Regional Correctional Administrators, Landry and Nash served from time to time as part of a panel of interviewers for open probation officer and probation officer assistant positions for the MDOC. CSMF ¶ 4. As Warden of the MCC, Landry has hiring authority for positions at that facility. *See* CSMF ¶ 135.

## II.    **Brandt's Early Probation Applications**

Between late 2012 and March of 2013, Brandt applied for five open probation officer and probation officer assistant positions within the MDOC. CSMF ¶¶ 20-21. During this timeframe, the MDOC granted interviews to internal applicants like Brandt so long as they met the position's minimum qualifications. CSMF ¶ 27. Brandt received an interview following each of his applications, but he was not hired to fill any of the openings.

As one example, in late 2012 the MDOC conducted a hiring process to fill two probation officer vacancies. CSMF ¶¶ 40-41. The MDOC selected Brandt and 24 other applicants for interviews, during which all applicants were asked the same set of questions. CSMF ¶ 42. Landry was one of three panelists who interviewed Brandt. CSMF ¶ 45.

The panel observed that Brandt had great potential and did well in his interview. CSMF ¶ 51. However, the panel also expressed concern about the fact that Brandt had referred to himself as a rigid, "black and white" thinker, a quality that the panel thought would impede the creative thinking often necessary to perform the job of a probation officer. CSMF ¶¶ 51, 173. The panel also noted that because of his lack of experience, Brandt would need very close supervision and support at the beginning of the job. CSMF ¶ 51. The MDOC ultimately hired one candidate who had experience as a federal probation officer and another candidate who was already employed by the MDOC as a probation officer assistant. CSMF ¶¶ 47, 49. The MDOC also rejected Brandt's applications for two Portland-based probation officer openings announced on December 4, 2012, and January 8, 2013, and for a probation officer assistant position that he interviewed for on March 27, 2013. CSMF ¶¶ 53-55, 63, 67, 76; Ex. 34 at 1 (ECF No. 83-3).

## III.    Brandt's Letter Complaint to the MDOC

On April 12, 2013, Brandt wrote a letter to Joseph Ponte, then the Commissioner of the MDOC, to express concerns about the MDOC's hiring process. CSMF ¶ 77. Brandt stated that he was "a Black male with over 15 years' experience in Federal law enforcement" and that "the purpose of this letter is to make you aware

that there are individual [sic] within the Maine Department of Corrections who has [sic][3] not adhered to the high diversity standards that you have set." CSMF ¶ 154; Ex. 25 (ECF No. 78-5). While neither Nash nor Landry saw the letter until 2017, CSMF ¶ 79, Landry admits that he learned through some source that Brandt had written the letter. Landry Dep. 17 (ECF No. 83-1).[4] Nash and Landry both participated in a conference call with Commissioner Ponte that was set up to discuss Brandt's concerns. CSMF ¶ 81. Landry avers that the call addressed whether the probation interview panels were giving fair consideration to correctional employees who applied for probation positions, and that neither racial discrimination nor Brandt's identity was mentioned. CSMF ¶ 82; Landry Dep. 17.

## IV.   August 2013 Probation Officer Recruitment

On August 16, 2013, the MDOC announced two vacancies for Portland-based probation officers. CSMF ¶ 84. Brandt interviewed for the positions on September 17, 2013. Ex. 48 at 1 (ECF No. 83-11). Nash served on Brandt's interview panel. CSMF ¶ 85. Landry, who by this time had taken his current position as Warden of the Maine Correctional Center, did not take part in the hiring process. CSMF ¶ 83.

Shortly before it announced the August 2013 vacancies, the MDOC changed its hiring process for probation officer positions. CSMF ¶ 86. In addition to meeting the minimum requirements for the position, applicants now had to pass an ergometric

---

[3]     Brandt's letter to Commissioner Ponte could be read to relate a claim either against one individual or against multiple individuals. I have considered both possibilities in reaching the conclusions that follow.

[4]     Nash did not learn that Brandt was the letter's author until 2017. CSMF ¶ 79; Nash Decl. ¶ 26 (ECF No. 85).

test designed to assess whether they were a good fit for the job before they could secure an interview. CSMF ¶¶ 88-90. At the interview phase, the MDOC now required panelists to score applicants on a rubric. CSMF ¶ 86. Interviewers asked applicants a set list of questions and then assigned the applicants a score of 0-4 in each of five categories: Commitment and job knowledge, judgment and logic, decision-making and decisiveness, communication skills, and ethics and integrity. CSMF ¶¶ 87, 95.

The panel did not recommend Brandt for either position. In their hiring justification, the interviewers zeroed in on Brandt's lack of client-focused case management or assessment experience, both of which the MDOC considers to be necessary competencies for probation officers. CSMF ¶¶ 15, 94; Ex. 53 at 4 (ECF No. 83-15). All three of Brandt's panelists ranked him at least four points lower than the successful applicant on a 20-point scale, and the successful applicant had 10 years of client-focused case management experience. CSMF ¶¶ 74, 93. For his part, Brandt recalls the interview as being "hostile," noting that the panelists did not shake his hand when he walked in until he extended his own, that they interrupted him several times, and that their body language suggested they were wondering why he kept applying. CSMF ¶ 96.

## V.   Brandt's Charge to the Maine Human Rights Commission

On November 20, 2013, Brandt submitted a complaint to the Maine Human Rights Commission ("**MHRC**") charging age- and race-based discrimination related to the MDOC's hiring practices. CSMF ¶ 135; Ex. 15 at 534 (ECF No. 77-5). The MDOC's human resources manager, Rhonda Hutchinson-Peaselee, assisted in

reviewing and gathering documents and responding to Brandt's charge. CSMF ¶ 137. Hutchinson-Peaselee avers that Landry was not involved in responding to the charge and that she, and not Landry, provided the MHRC with any documents related to him. CSMF ¶¶ 137-139. Neither Landry nor Nash were informed of the MHRC charge until April of 2014. CSMF ¶ 138.

## VI.   December 2013 Probation Officer Assistant Recruitment

The MDOC posted a vacancy for a probation officer assistant on December 5, 2013. CSMF ¶ 99-100. Brandt applied, and Nash was again among his interview panelists. CSMF ¶ 101.

As before, Brandt was passed over for the position in favor of a candidate with client-focused case management experience who received higher interview scores than Brandt from all three panelists. CSMF ¶¶ 103-106. The panel also noted the Brandt did not appear to be clear on the MDOC's mission or about the roles and responsibilities of the position for which he was applying. CSMF ¶ 101.

## VII.   Brandt's Resignation from the MDOC and Applications for Rehire

On January 8, 2014, Brandt resigned from his position at the MDOC. CSMF ¶ 110. Brandt informed his supervisors that he was going to pursue a job opportunity with the Federal Bureau of Prisons ("**BOP**"). CSMF ¶ 112. As a tenured employee of the federal government, Brandt had reason to believe that he would be hired for a job opening with the BOP's Berlin, New Hampshire facility ("**BOP Berlin**"). CSMF ¶¶ 114, 116. The BOP offered Brandt the position over the phone in December of 2013, and he was scheduled to begin working at BOP Berlin on February 18, 2014. CSMF ¶¶ 117-119. However, at some point prior to February of 2014, BOP Berlin

6

informed Brandt that he would not be able to start work because of a hiring freeze. CSMF ¶ 120.

His application to BOP Berlin now up in the air, Brandt began to apply for openings at the MDOC. Between January and April of 2014, Brandt applied for four positions: (1) correctional unit manager at the MCC in January 2014, (2) corrections officer at the MCC (his old job) in February 2014, (3) correctional care and treatment worker in March 2014, and (4) juvenile program specialist at Long Creek Youth Development Center in March 2014. CSMF ¶ 153.

Brandt interviewed for the MCC unit manager position on February 3, 2014. CSMF ¶ 180. Gary LaPlante, Landry's deputy, was on Brandt's interview panel. CSMF ¶ 181. After the interview, LaPlante followed Brandt into the hallway and asked about the BOP position, at which point Brandt told LaPlante that he understood there was a hold-up because of a hiring freeze. CSMF ¶ 181.

On or before February 23, 2014, Brandt contacted the MDOC about the possibility of reinstatement to his job as a corrections officer. CSMF ¶ 123; Ex. 64 at 828 (ECF No. 82-2). The MDOC told Brandt that he could apply for reinstatement without being required to take the ergometric test usually used for new hires. CSMF ¶ 124.

Landry and LaPlante were concerned about Brandt's future employment plans and whether, if rehired, he intended to stay at MCC. CSMF ¶ 125. Landry asked Valerie Norman, a unit manager with the MCC, to conduct an informal interview of Brandt to determine if rehire was appropriate. CSMF ¶ 126. During that interview,

on March 11, 2014, Brandt told Norman that the BOP job "fell through due to a hiring freeze." CSMF ¶ 128. Norman passed this information on to Landry and LaPlante. CSMF ¶ 129.

Based on his contacts in the correctional field, LaPlante believed that BOP Berlin was not subject to a hiring freeze, and so he doubted Brandt's story. CSMF ¶ 130. Without consulting Landry, LaPlante called BOP Berlin's human resources department to obtain information about their hiring status. CSMF ¶ 131, 200. This was the only time during LaPlante's career that he independently called someone to verify facts related to him by a job applicant. CSMF ¶ 201. The employee LaPlante spoke with told him that no hiring freeze was in effect, and that even one had been active, BOP Berlin was exempted because of a staffing shortage. CSMF ¶ 131. LaPlante also asked the human resources employee about Brandt's application to work at BOP Berlin. LaPlante described the employee's responses to those questions as "evasive." *See* CSMF ¶ 192.

On March 12, 2014, LaPlante emailed Norman and Landry to relay his suspicion that Brandt had lied during his interview with Norman and to recommend that he not be rehired. CSMF ¶ 134. Following LaPlante's email, Landry elected not to rehire Brandt. CSMF ¶ 135. On March 24, 2014, Brandt filed an amended charge with the MHRC to add retaliation allegations. CSMF ¶ 146.

## PROCEDURAL BACKGROUND

On November 16, 2015, the Plaintiff filed his initial Complaint in this action *pro se*, asserting four counts against all Defendants: racial discrimination in violation

of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; age discrimination in violation of the Age Discrimination in Employment Act ("**ADEA**"), 29 U.S.C. § 621; retaliation for engaging in protected conduct under Title VII and the ADEA; and violation of the Veterans Employment Opportunities Act of 1998, 5 U.S.C. § 3330a. (ECF No. 1.) In March of 2016, the Defendants moved to dismiss. Nash's Mot. to Dismiss (ECF No. 9); State Defs.' Mot. to Dismiss (ECF No. 10). On April 19, 2016, Brandt moved to amend his Complaint to add a claim against all Defendants for "racial discrimination in violation of 42 U.S.C. § 1983." Mot. to Amend (ECF No. 15). On December 5, 2016, I granted in part and denied in part the motions to dismiss and granted the Plaintiff's motion for leave to amend. (ECF No. 28.)

Brandt secured representation as of January 10, 2017, and the parties proceeded to discovery. (ECF No. 33.) On March 2, 2018, the Defendants moved for summary judgment on all remaining claims. Nash's Mot. (ECF No. 87); State Defs.' Mot. In his response to the summary judgment motions, the Plaintiff voluntarily withdrew his age discrimination claims against all Defendants (Count II) and his remaining claim against Nash (Count V). Pl.'s Resp. 3 n.3 (ECF No. 91). The Plaintiff also stipulated that "only events occurring *after* April 12, 2013 . . . are actionable against the Department and Defendant Landry." Pl.'s Resp. 2. As the Plaintiff no longer asserted any claims against Nash, I granted Nash's motion for summary judgment on May 24, 2018. Order (ECF No. 97). I likewise now **GRANT** without objection the State Defendants' motion for summary judgment on the Plaintiff's age discrimination claims.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine where a reasonable jury could resolve the point in favor of either party. *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). A fact is material where it could influence the outcome of the litigation. *Id.* On a motion for summary judgment, courts must construe the record in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016). However, "neither conclusory allegations, improbable inferences, and unsupported speculation, nor brash conjecture coupled with earnest hope that something concrete will materialize, is sufficient to block summary judgment." *J. Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996) (marks and citations omitted).

## DISCUSSION

Landry and Fitzpatrick seek summary judgment on all remaining Counts. Still pending are the Plaintiff's claims against the MDOC for racial discrimination under Title VII (Count I), against the MDOC for retaliation under Title VII (Count III), and against the MDOC and Landry for racial discrimination in violation of 42 U.S.C. § 1983 (Count V).

I.      **Title VII**

      A.   **Whether the MDOC Discriminated Against the Plaintiff Because of his Race**

To survive summary judgment on a Title VII employment discrimination claim, a plaintiff must show that he suffered an adverse employment action because of a protected characteristic. 42 U.S.C. § 2000e-2(a)(1). Where, as here, the plaintiff lacks direct evidence of discrimination, he may establish discriminatory intent either through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or through the mixed-motive framework established in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and codified at 42 U.S.C. § 2000e-2(m).

Through his briefing, the Plaintiff narrows the universe of alleged misconduct to events that occurred after April of 2013. Pl.'s Resp. 2. Accordingly, the Plaintiff's asserted adverse employment actions are the MDOC's failure to hire him as a probation officer during August of 2013 or as a probation officer assistant in December of 2013, and the MDOC's failure to rehire him to any of the four positions for which he applied beginning in January of 2014.

Although the Plaintiff's employment discrimination argument is lean, he includes the language of both the *McDonnell Douglas* and mixed-motive theories of discrimination. Pl.'s Resp. 10 (arguing that "a reasonable jury could find . . . that race was a substantial motivating factor in the decision not to hire the plaintiff"); Pl.'s Resp. 10 (asserting that "the defendant's proffered reason for the adverse employment action . . . is a pretext"). I will consider each theory in turn.

### 1.    The *McDonnell Douglas* Framework

At the first step of the *McDonnell Douglas* framework, the plaintiff must "establish, by a preponderance of the evidence, a prima facie case of discrimination." *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 57 (1st Cir. 2018). In this failure-to-hire action, the Plaintiff can surmount this low barrier by showing that: "(1) []he is a member of a protected class, (2) []he was qualified for the open position for which []he applied, (3) []he was rejected for that position, and (4) someone holding similar qualifications received the position instead." *Goncalves v. Plymouth Cty. Sheriff's Dep't*, 659 F.3d 101, 105 (1st Cir. 2011). If the Plaintiff makes this showing, the MDOC must articulate a legitimate explanation for rejecting Brandt's employment applications. *Id.* If the MDOC does so, the Plaintiff must show that the proffered explanation is pretextual and that the actual reason for the MDOC's decision is discriminatory. *Id.* at 804. At this final stage, the Plaintiff "must demonstrate either that the adverse employment action was (1) 'more likely motivated' by discrimination than by the explanation proffered by the defendant; or (2) 'the proffered explanation [was] unworthy of credence' where the suspect action, coupled with evidence to the contrary, suggests a discriminatory motivation." *Aly v. Mohegan Council, Boy Scouts of Am.*, 711 F.3d 34, 46 (1st Cir. 2013) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The State Defendants argue that the Plaintiff has failed to present a prima facie case either related to his probation applications or related to his rehire applications. As to the rehire positions, the State Defendants are correct. The Plaintiff has offered no evidence regarding the disposition of those positions,

including whether they were filled by anyone at all or whether they were held open. In addition, while it may be possible to assume that the Plaintiff met the minimum qualifications for his previously-held position as a corrections officer, the Plaintiff has presented no evidence whatsoever that he was qualified for the other three rehire positions. The Plaintiff's burden to make out a prima facie case is low, not nonexistent, and the *McDonnell Douglas* avenue is closed to the Plaintiff as to these hiring decisions.

I turn to the Plaintiff's probation applications. There is no dispute that the Plaintiff is a member of a protected class, that he met the MDOC's minimum qualifications for the probation positions for which he applied, and that he applied to those positions. The MDOC contends, however, that the Plaintiff cannot make out a prima facie case because he had inferior qualifications to the successful applicants and therefore cannot be considered similarly qualified.

The undisputed facts suggest that the Plaintiff, like the successful applicants, secured an interview only after the MDOC decided he was minimally qualified and, for his August 2013 probation officer application, after "mak[ing] the cut" on an ergometric test designed to assess whether he was a good candidate for the job. CSMF ¶¶ 27, 87-91. In addition, the Plaintiff offers some evidence that, contrary to the MDOC's assessment, he possessed a similar skillset to the candidates who were hired. CSMF ¶ 150. Taking the facts in the light most favorable to the Plaintiff, I find that he has met the low burden of establishing his prima facie case.[5]

---

[5]     *Goncalves v. Plymouth County Sheriff's Department*, 659 F.3d 101 (1st Cir. 2011), on which the State Defendants rely, is distinguishable. The Plaintiff in *Goncalves* admitted that she lacked even

The MDOC's asserted non-discriminatory explanation for its hiring decisions overlaps with its argument that the Plaintiff was not similarly situated to the successful candidates—namely, that the Plaintiff lacked experience and job knowledge that the other applicants possessed. This explanation satisfies the MDOC's minimal burden to articulate a nondiscriminatory reason for rejecting the Plaintiff's applications.

Under the *McDonnell Douglass* framework, it falls to the Plaintiff to show that the MDOC's explanation is pretextual. He has not done so. The Plaintiff offers no argument on pretext as it relates to the probation positions, effectively conceding the issue. The closest the Plaintiff comes to addressing this point is his factual representation that he was equally as qualified for the probation positions as the individuals who were hired. That is not enough. The undisputed facts are that (1) every member of both interview panels gave the Plaintiff a lower score than they gave the successful applicants, and (2) the Plaintiff failed to articulate to his interviewers that he had experience or training in either of two key competencies. Absent any other evidence that the individuals responsible for the probation hires acted out of racial animus—and the Plaintiff presents none—the only reasonable inference that may be drawn is that the Plaintiff's applications were rejected because his interviewers

---

the posted minimum qualifications for the position for which she applied. The individuals who were hired did not, leaving them differently qualified from the plaintiff. Here, the Plaintiff vigorously contests the MDOC's characterization of his skillset and of his application materials, which he says show that he was as qualified for the probation positions as the people who were hired. Moreover, unlike in *Goncalves*, where the defendant put the plaintiff forward for an interview in spite of the fact that she was unqualified, here the State Defendants admit that the MDOC only offered interviews to applicants who met a position's minimum qualifications. CSMF ¶¶ 25, 27, 87-91.

believed he was not the best fit.[6] The Plaintiffs' discrimination claims fail under the *McDonnell Douglas* framework.

### 2.      Mixed-Motive Framework

Under the mixed-motive framework, a plaintiff "need prove only that the discriminatory action was a *motivating factor* in an adverse employment decision." *Patten v. Wal-Mart Stores E., Inc.*, 300 F.3d 21, 25 (1st Cir. 2002). Once the plaintiff has done so, "the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision regardless of the impermissible consideration." *Diaz v. Jiten Hotel Mgmt., Inc.*, 671 F.3d 78, 82 (1st Cir. 2012). This second step represents a limited affirmative defense and does not absolve the defendant of liability, but rather restricts the remedies available to the plaintiff. *Burns*, 829 F.3d at 9 n.9.

I again begin by considering the MDOC's handling of the Plaintiff's rehire applications. The Plaintiff insists that a reasonable jury could find that the MDOC's decisions were, at least in part, the product of racial animus. The Plaintiff's theory appears to be that, because of his race, the MDOC sought out any reason it could find not to rehire him. In support of this theory, the Plaintiff advances two lines of argument. First, the Plaintiff attempts to establish that while Landry was serving on MDOC panels that interviewed Brandt in 2012 and early 2013, his conduct suggested

---

[6]      In their statement of facts, the parties reference the Plaintiff's testimony that he found his September 2013 interview to be "hostile" because the panelists did not offer to shake his hand before he extended his, interrupted him, and had negative body language. CSMF ¶ 96. However, the Plaintiff never brings this point up in his briefing. More significantly, even in his deposition the Plaintiff did not connect this hostility to his race, instead asserting that the panelists' behavior suggested they were wondering why he kept applying. CSMF ¶ 96.

15

a race-based bias against the Plaintiff. The Plaintiff's implication is that when Landry later chose not to rehire Brandt, that decision was a product of his bias. In support of this position, the Plaintiff points to Landry's description of Brandt as being a "black and white" or "concrete" thinker, which the Plaintiff argues are racial stereotypes. Pl.'s Resp. 10. The Plaintiff also notes that during an interview in January 2013, Landry cut Brandt off in the middle of his answer to a question, and that one of the interviewers, all of whom were armed, escorted Brandt out of the area. Pl.'s Resp. 6.

None of these facts create a plausible inference of racial animus. Even accepting that ascribing "black and white" thinking to someone can constitute racial stereotyping, that characterization does not hold here because the record reveals that Brandt introduced the term "black and white" to describe his own thinking. CSMF ¶¶ 173, 174.[7] As to Landry's conduct during the January 2013 interview, the fact that Landry interrupted the Plaintiff, without more, does not indicate racial bias. Similarly, that Brandt's interviewers remained armed during his interview and that one of them walked him out of the interview room sounds alarming, but the State Defendants point out that it was not unusual for the interviewers to be armed because all of them were on-duty law enforcement officers. More to the point, the Plaintiff has not presented evidence (for example, evidence that non-black applicants received a different welcome or left without escort) to connect that behavior to his race.

---

[7]      Even the Plaintiff does not suggest that "black and white" referred to race, as opposed to an inability to perceive grey areas.

As his second avenue of argument, the Plaintiff claims that Landry displayed racial animus at the time of Brandt's re-hiring applications when he rushed to accept bad information that branded the Plaintiff a liar. The Plaintiff avers, and the State Defendants do not dispute, that he was told by BOP Berlin that he could not begin work because of a hiring freeze. That is, it is undisputed that Brandt did not lie to anyone at the MCC. Referencing LaPlante's telephone conversation with a BOP human resources employee, the Plaintiff asserts that "no reasonable person charged with hiring would rely on unsubstantiated hearsay from an anonymous 'evasive' source outside the normal hiring channels to conclude a decorated veteran . . . was 'lying' about a hiring freeze." Pl.'s Resp. 10.

That an employer's explanation for an employment decision is untrue can be evidence that the true reason was discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000). However, the First Circuit has found that, so long as the employer's explanation does not itself evince discrimination, the proper focus is not on whether the employer's assessment was accurate but on "whether the employer believed its stated reason to be credible." *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 45 (1st Cir. 2002); *Melendez v. Autogermana, Inc.*, 622 F.3d 46, 53 (1st Cir. 2010) (insufficient evidence of discrimination where "the record support[ed] the conclusion that, at the time of [the plaintiff's] dismissal, [the defendant] believed that [the plaintiff] was not meeting the company's legitimate performance expectations"); *see also Bennett v. Saint-Gobain Corp.*, 453 F. Supp. 2d 314, 327 (D. Mass. 2006) ("Where, as here, the employer's reason for termination is

based on the results of an investigation into alleged misconduct by the plaintiff, the inquiry is not whether the plaintiff's version of events is true, but whether the decision-maker reasonably believed that the plaintiff had engaged in misconduct."), *aff'd*, 507 F.3d 23 (1st Cir. 2007).

Here, the Plaintiff fails to establish that Landry had any reason to suspect that the information LaPlante had given him was incorrect. When he emailed Landry to recommend against rehiring Brandt, LaPlante did not mention the fact that the BOP human resources staff member with whom he had spoken had been "evasive" about certain questions. LaPlante Email (ECF No. 82-4). And while LaPlante went "outside the normal hiring channels" to obtain his information, he told Landry that he had done so based on his belief that the BOP was not in a hiring freeze—an understanding that LaPlante reasonably sought to confirm. LaPlante Email. Under these facts, Landry could reasonably rely on LaPlante's recommendation. The Plaintiff is left to argue that he had been a respected employee at the MCC and was a decorated veteran who had previously run high-profile protection details. *See* Pl.'s Resp. 10. The Plaintiff implies that his credentials suggested he was highly trustworthy, and that therefore Landry would not have taken LaPlante's information at face value unless Landry was acting out of racial animus. While this point has some intuitive appeal, the Plaintiff does not support it with evidence. On the facts presented, a jury could not determine without speculating that Landry acted with discriminatory motive.[8]

---

[8]    I do not intend to imply that a plaintiff cannot possibly make out a claim based on implicit bias. "Title VII's prohibition against 'disparate treatment because of race' extends both to employer acts based on conscious racial animus and to employer decisions that are based on stereotyped thinking or other forms of less conscious bias." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42 (1st Cir. 1999).

To the extent that the Plaintiff intends to proceed on a "cat's paw" theory—that is, if he means to argue that the MDOC can be held liable for racial animus evidenced by LaPlante even though he did not make any final hiring decisions—that argument also fails. "To invoke the cat's paw analysis, [a plaintiff] must submit evidence sufficient to establish two conditions: (1) that [the non-decisionmaker] exhibited discriminatory animus; and, (2) and the final decisionmakers . . . acted as the conduit of [that] prejudice." *Harlow v. Potter*, 353 F. Supp. 2d 109, 115 (D. Me. 2005). Here, the Plaintiff has not shown that race was a motivating factor in LaPlante's actions. While the Plaintiff implies otherwise, LaPlante did not baselessly question Brandt's motivations or veracity. The Plaintiff does not dispute that LaPlante had a preexisting understanding that BOP Berlin was not under a hiring freeze. CSMF ¶ 130. When LaPlante reached out to the BOP to get additional information, he spoke to a human resources employee, who he could reasonably expect to give accurate information regarding that organization's ability to hire. CSMF ¶ 131. And while LaPlante described that employee's responses to his questions about Brandt's job application as "evasive," LaPlante gave no such qualification of the employee's response to his question about whether BOP was subject to a hiring freeze. LaPlante Dep. 9-10 (ECF No. 77-4). None of this suggests that LaPlante acted out of racial bias, and therefore no such motive may be imputed to the final decision not to hire the Plaintiff.

---

I do find, however, that the Plaintiff in this case has failed to develop or to present evidence of such a situation.

19

The Plaintiff also asserts, without accompanying argument, that he was treated differently than other applicants for rehire at the MDOC. Pl.'s Resp. 7. The Plaintiff observes that the only other rehire candidate of which the State Defendants are aware, "John Doe," was not subjected to a "background check" in the manner the Plaintiff was, and that LaPlante had not previously made external inquiries about any job candidate's statements. Pl.'s Resp. 7, 9. Again, these facts do not suffice to establish discriminatory motive. While plaintiffs may rely on comparator evidence to support an inference of discrimination, the comparator must be similarly situated "in all relevant respects." *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 114 (1st Cir. 2015) (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003)). Here, the relevant similarities would include that the applicant offered the MDOC information that it had reason to suspect was false. Because the Plaintiff has not shown that the MDOC had any reason to believe that John Doe was untruthful during his interview, the comparison fails.

Turning briefly to the probation positions: The Plaintiff presents neither argument nor evidence sufficient to suggest that the MDOC acted with mixed motives when it denied the Plaintiff's applications for those jobs. In sum, on the evidence in the record, a reasonable jury could not conclude, without resorting to unfounded speculation, that the MDOC's refusal to promote or to rehire Brandt "was more probably than not caused by discrimination." *Burns*, 829 F.3d at 12. The State Defendants' motion for summary judgment on the Plaintiff's Title VII race discrimination claim is **GRANTED**.

## B.   Whether the MDOC Retaliated against the Plaintiff for Engaging in Protected Conduct

The Plaintiff also claims that the MDOC failed to rehire him in retaliation for his complaints of racial discrimination to Commissioner Ponte and to the MHRC. To establish that he was retaliated against in violation of Title VII[9] a plaintiff must show that "(1) []he engaged in protected conduct under [the statute]; (2) []he suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity." *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009). Once the plaintiff makes out this prima facie case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory explanation for its actions. *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015). If the defendant does so, the plaintiff must show that the defendant's explanation is a pretext for retaliation. *Id.*[10]

The parties dispute whether the Plaintiff has satisfied the causation prong of his prima facie case. The Plaintiff claims that the short lapse in time between his complaints and his rejected job applications is enough to show causation. The State Defendants disagree, arguing that the individuals responsible for those hires were not aware of the Plaintiff's complaints until April of 2014 at the earliest, and that therefore their decisions cannot have been impacted by the Plaintiff's complaints.

---

[9]    As Brandt has dropped his claims for age-based discrimination and as Brandt has presented neither facts nor argument to suggest that he was retaliated against for engaging in protected conduct related to his age, I do not consider whether Brandt was subjected to retaliation under the ADEA.

[10]    The mixed-motive framework has no application to retaliation claims: "[A] plaintiff making a retaliation claim . . . must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

As the First Circuit has explained, "if a supervisor or other employee is unaware of the fact that a plaintiff engaged in protected conduct, any actions attributable to him could not plausibly have been induced by retaliatory motives." *Alvarado v. Donahoe*, 687 F.3d 453, 459 (1st Cir. 2012). The only supervisors or employees about which the Plaintiff has presented any evidence are Nash, Landry, and LaPlante. I consider each separately.

As to Nash, the Plaintiff admits that she was not made aware of his MHRC charge until this lawsuit was filed, and she therefore cannot have taken that complaint into account during the hiring process. And while the Plaintiff argues that Nash had reason to be aware of his April 2013, letter to Commissioner Ponte, he presents no evidence to contradict Nash's testimony that she did not learn Brandt had authored the letter until 2017. *See* Nash Decl. ¶ 28 (ECF No. 85). LaPlante may likewise be set aside, as the Plaintiff presents no evidence to show that LaPlante was aware of either of Brandt's complaints before April of 2014. CSMF ¶ 141.[11]

This leaves only Landry. Unrefuted evidence shows that Landry was not informed of Brandt's MHRC charge until after the hiring decisions at issue. CSMF ¶ 138.[12] Landry has, however, testified that he was made aware that Brandt had

---

[11]     Brandt seeks to combat this point by noting that "LaPlante was a broker of information in corrections circles who Landry relied upon." CSMF ¶ 141. To the extent Brandt means to say that I may impute LaPlante's knowledge to Landry and vise-versa, I decline to adopt that unsupported conclusion.

[12]     The Plaintiff argues that because Landry was the Warden of the MCC, a reasonable jury could assume he was aware of the charge. But the Plaintiff cannot survive summary judgment by meeting evidence—here, the testimony of MDOC human resources manager Rhonda Hutchinson-Peaslee that Landry was neither informed of nor involved in responding to the MHRC charge, CSMF ¶ 137—with speculation. *Alvarado v. Donahoe*, 687 F.3d 453, 460 (1st Cir. 2012) (plaintiff's assertion that his

authored the earlier letter to Commissioner Ponte. The State Defendants claim that Landry never saw the letter and did not know it related a race discrimination complaint. Viewing the evidence in the light most favorable to the Plaintiff, I find that a reasonable jury could conclude, despite Landry and Nash's protestations, that Landry learned through the conference call with Commissioner Ponte that the letter discussed racial discrimination. Given the letter's plain discussion of racially biased hiring and Nash and Landry's inability to remember the conference call's precise content, it would be appropriate to allow a jury to assess the credibility of Nash and Landry's testimony that Commissioner Ponte's call addressed only the portion of Brandt's letter that did not relate to discrimination.

Regardless of Landry's knowledge of the letter's contents, the evidence of a causal connection between the letter and Landry's decision not to rehire Brandt is negligible—likely fatally so.[13] However, because I ultimately find for the Defendants, I will assume that necessary link and proceed with the burden-shifting analysis.

The MDOC asserts that Landry decided not to rehire Brandt based on LaPlante's representation that Brandt had been dishonest about why he was seeking to return to the MCC. This satisfies the MDOC's burden to proffer a legitimate basis

---

supervisors " 'should have known' about his protected conduct by virtue of their managerial status," was "not only flimsy but fatally so").

[13]    The Plaintiff's letter and Landry's hiring decisions were separated in time by at least nine months—too long, standing alone, to allow an inference of retaliatory intent. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that temporal proximity must be "very close" and that periods of three and four months have been held insufficient); *Morón-Barradas v. Dep't of Educ. of Com. of Puerto Rico*, 488 F.3d 472, 481 (1st Cir. 2007) (finding a lapse of "more than eight months . . . insufficient to establish temporal proximity").

for that hiring decision. Thus, the Plaintiff must show that the MDOC's explanation is pretextual.

The evidence does not support a finding of pretext. As discussed above, it is not enough for the Plaintiff to claim that the information LaPlante provided to Landry about the BOP hiring freeze was inaccurate, where there is no evidence that Landry had reason to disbelieve that information.[14] Having failed to establish that any MDOC decisionmaker took an adverse action against him because of his protected conduct, the Plaintiff cannot succeed on a claim for retaliation. The State Defendants' motion for summary judgment on the Plaintiff's Title VII retaliation claim is **GRANTED**.

## II.     **42 U.S.C. § 1983**

In Count V of his Amended Complaint, the Plaintiff asserts a claim against Landry and the MDOC for "racial discrimination" in violation of 42 U.S.C. § 1983. Am. Compl. ¶¶ 29-30. The Plaintiff's allegations describe a claim under the Equal Protection Clause of the Fourteenth Amendment. *See* Am. Compl. ¶ 30 (alleging that "[t]he stated reasons for the Defendant's conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory motives").

"To prevail on a claim of racial discrimination in violation of the Equal Protection Clause, a plaintiff must establish (1) that he was selected for adverse treatment compared with others similarly situated, and (2) that the selection

---

[14]     The Plaintiff's "cat's paw" theory—i.e., that LaPlante's retaliatory motive may be imputed to Landry, Pl.'s Resp. 14—fails because LaPlante was unaware of Brandt's complaints and therefore cannot have acted in retaliation to those complaints. *See Harlow v. Potter*, 353 F. Supp. 2d 109, 115 (D. Me. 2005).

for adverse treatment was based on his race." *Rios-Colon v. Toledo-Davila*, 641 F.3d 1, 4 (1st Cir. 2011). The First Circuit has recognized that the "analytical framework for proving discriminatory treatment . . . is equally applicable to constitutional and Title VII claims." *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 896 (1st Cir. 1988). In either case, "the plaintiff must prove that the defendant[s] acted with discriminatory intent." *Rivera v. Puerto Rico Aqueduct & Sewers Auth.*, 331 F.3d 183, 192 (1st Cir. 2003). In addition, "[s]ome evidence of actual disparate treatment is a threshold requirement of a valid equal protection claim." *Ayala–Sepúlveda v. Mun. of San Germán*, 671 F.3d 24, 32 (1st Cir. 2012) (quotation marks omitted). Here, the Plaintiff bases his equal protection claim on the same facts as his Title VII claim for racial discrimination. Assuming *arguendo* that the Plaintiff is entitled to bring an equal protection claim against Landry, which the State Defendants contest,[15] that claim fails against him and against the MDOC for the same reasons outlined above.

The Plaintiff further attempts to hold Landry and the MDOC liable under § 1983 for retaliation under the Equal Protection Clause or under the First Amendment. Pl.'s Resp. 3. Section 1983 does not create substantive rights, but rather provides a procedural mechanism for vindicating constitutional or statutory rights. *Baker v. McCollan*, 443 U.S. 137, 145 (1979). "Hence, it is [the] plaintiff['s] burden to identify the particular underlying constitutional or statutory right that is sought to be enforced via judicial proceedings." *Bibiloni Del Valle v. Puerto Rico*, 661 F. Supp. 2d 155, 177-78 (D.P.R. 2009). The Plaintiff did not allege a § 1983 retaliation claim of

---

[15]     *See* State Defs.' Reply 4-5 (ECF No. 101).

any kind in his Amended Complaint and has not sought further amendment even after retaining counsel. As the time set for amendments by this court's scheduling order has now expired, to further amend his complaint the Plaintiff would need to show good cause for the delay. *Steir v. Girl Scouts of the USA*, 383 F.3d 7, 12 (1st Cir. 2004). He has not done so, nor likely could he. Moreover, because the Defendants have moved for summary judgment, the Plaintiff would need to demonstrate that the additional amendments were supported by "substantial and convincing evidence." *Adorno v. Crowley Towing & Transp. Co.*, 443 F.3d 122, 126 (1st Cir. 2006). The Plaintiff has not made such a showing. Instead, as discussed above, the Plaintiff has failed to develop any evidence to show that Landry's proffered reason for not hiring Brandt was pretextual.[16] The State Defendants' motion for summary judgment on the Plaintiff's constitutional claims is, accordingly, **GRANTED**.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants Fitzpatrick and Landry's motion for summary judgment. The case is **DISMISSED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 16th day of January, 2019.

---

[16]    Because I find that the Plaintiff has failed to plead a § 1983 retaliation claim, I do not address whether Landry would be entitled to qualified immunity on such a claim. *See* State Defs.' Reply 4, 6.